# United States Court of Appeals
## For the First Circuit

No. 06-2044

UNITED STATES OF AMERICA,

Appellee,

v.

JOSE JIMENEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Torruella and Howard, Circuit Judges,

and Delgado-Colón,* District Judge.

Jeffrey L. Baler for appellant.
    B. Stephanie Siegmann, Assistant United States Attorney,
with whom Michael J. Sullivan, United States Attorney, was on
brief, for appellee.

October 31, 2007

* Of the District of Puerto Rico, sitting by designation.

**HOWARD, Circuit Judge.** Jose Jimenez was convicted of misappropriating the identities of two people long dead. He raises two challenges, one relating to all the charges and the other only to the two counts of aggravated identity theft. First, Jimenez argues that certain evidence admitted at trial should have been excluded for want of relevance or because it was unduly prejudicial. Second, he claims that "person" in the statute defining aggravated identity theft refers only to the living. In the alternative, he argues that the statute is sufficiently ambiguous to require reversal under the rule of lenity. We affirm.

## I. Facts

In January, 2005, Jose Jimenez was stopped pursuant to a warrant by Springfield, Massachusetts police. He identified himself as Barry Abraham and provided a driver's license with that name on it. Subsequent searches revealed many documents in the name Barry Abraham, including a United States passport and Social Security card, a tax return, a credit card statement, and bank records. Mixed in with the correspondence addressed to Barry Abraham were Verizon telephone bills addressed to David Davison, although the real Davison was long deceased. The searches also revealed the birth and death certificates of Michael Ian Figueroa, who died in 1978, and a document from 2002 certifying a change of name from Michael Ian Figueroa to Barry Abraham. The death certificate of an unrelated Jared Figueroa was also found, as well

-2-

as official responses to requests for his birth certificate. Investigators discovered the high school and college transcripts of many other individuals as well as handwritten lists of names and biographical data, including the names and information of Davison and Jared Figueroa. Another page of handwritten notes concerned credit reporting agencies and the Orange County, California Clerk's office, and on the reverse of this sheet were Michael Ian Figueroa's name and Social Security number. Finally, a computer disk seized during one search contained electronic documents entitled "The Anarchist Cookbook 2000," "Ebay secrets/internet spy toolkit," and "confidential info on anyone and credit." These electronic documents detailed how to establish a false identity, how to search the Social Security death database, and related topics.

Jimenez was tried on nine counts relating to the acquisition and use of the identities of Michael Ian Figueroa and David Davison.[1] He moved *in limine* to exclude evidence that did

---

[1] Count One, under 18 U.S.C. § 1542, Passport Fraud, related to false statements made on his passport application in the name of Barry Abraham. Four of the five counts of Social Security Fraud, 18 U.S.C. § 408(a)(7)(b), arose from the use of Michael Ian Figueroa's Social Security number on various applications; the remaining count stemmed from the use of David Davison's Social Security number to initiate telephone service with Verizon; these counts were numbered Two through Six. Count Seven, Furnishing False Information to Social Security Administration, 42 U.S.C. § 408(a)(6), concerned the application for a Social Security card in the name Barry Abraham, seeking a card with that name and Michael Ian Figueroa's Social Security number. Finally, Counts Eight and Nine, the two counts of aggravated identity theft, took as

not directly relate to the specific identities at issue, including the high school transcripts, the lists of other names with biographical data, and the electronic documents. He claimed both that the evidence was not relevant and that prejudicial impact upon the jury outweighed any probative value. The district court admitted the evidence but restricted the use of the "Anarchist Cookbook," preventing use of the title of the document and allowing use only of the section entitled "How to Create a New Identity." Jimenez was convicted by the jury on all nine counts.

## II. The motion *in limine*

Jimenez makes three arguments relating to the following five kinds of evidence: (i) documents on the computer disk; (ii) handwritten lists of others' biographical data (names, Social Security numbers, dates and places of birth and death); (iii) high school and college transcripts; (iv) the death certificate, and denials of requests for the birth certificate, of Jared Figueroa; and (v) the handwritten sheet with information about the Orange County Clerk's office and various credit reporting agencies. First, he contends that such evidence should have been excluded because it is irrelevant. Second, he claims that even if relevant, the evidence should have been excluded because it is mere character evidence with no "special probative value." Last, he claims that

_____

predicate offenses the other seven counts.

-4-

the evidence, even if otherwise admissible, should have been excluded because it is too prejudicial. We disagree.

We review evidentiary rulings for an abuse of discretion. United States v. Turner, 2007 U.S. App LEXIS 20981, at *26 (1st Cir. Aug. 31, 2007); United States v. Perez-Gonzalez, 445 F.3d 39, 47 (1st Cir. 2006). The district court made no written resolution of the motion *in limine*, and at trial the treatment of the objection was cursory. But defense counsel did raise the objection and therefore is not relying solely on the motion *in limine*. See United States v. Griffin, 818 F.2d 97, 105 (1st Cir. 1987) ("[T]o raise and preserve for review the claim of improperly constructing the Rule 403 balance, a party must obtain the order admitting or excluding the controversial evidence in the actual setting of the trial.").

Jimenez first challenges the admission of the evidence on the ground that it is not relevant. "Evidence which is not relevant is not admissible." Fed. R. Evid. 402. "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. We reject Jimenez's argument that none of this evidence relates to any element of any of the charges brought.

In our view, the evidence supports the goverment's claim that Jimenez was engaged in an effort to misappropriate identities,

-5-

and that the specific acts he is charged with were the culmination of that effort. The electronic documents show how he learned how to commit the offenses. The fact, adduced at trial, that Jimenez's modus operandi very closely mirrored that set forth in "How to Create a New Identity" is directly relevant to this theory. The handwritten lists of biographical information likewise present evidence of a person in the process of committing identity theft. The piles of high school and college transcripts, the information and documents concerning Jared Figueroa, and the information about credit reporting agencies and the Orange County Clerk's office all flesh out the jury's sense of the *crime*, not just the man. They therefore meet the initial threshold of relevance under Rule 401.

Jimenez also argues that, even if relevant, the evidence is inadmissible under Rule 404. That rule excludes evidence of prior "bad acts" when it is offered merely to prove the defendant's character.[2] Such evidence is admissible, however, to show "preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). We have interpreted Rule 404(b) to require some "special relevance," that is, a "purpose other than solely to prove that the defendant had a propensity to commit the crime in question." United States v. Aguilar-Aranceta, 58 F.3d 796, 798 (1st Cir. 1995). With this as our guide we examine the evidence

---

[2] Fed. R. Evid. 404(a) ("Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith.").

for "at least one permissible inference." United States v. Nickens, 955 F.2d 112, 125 (1st Cir. 1992) (quoting United States v. Ferrer-Cruz, 899 F.2d 135, 138 (1st Cir. 1990)). The showing of special relevance is not particularly demanding. In another identity theft case, we held there was no abuse of discretion in admitting evidence that the defendant was a resident in a federal halfway house (and therefore necessarily a former inmate of a federal prison), because the halfway house was convenient to the ATMs used in the scheme, and this had special relevance to the defendant's "opportunity" to commit the crime. United States v. Scott, 270 F.3d 30, 47 (1st Cir. 2001).

Here, the evidence shows preparation and plan.[3] The handwritten lists demonstrate preparation for the act of misusing the Social Security number of the late Mr. Davison in order to obtain telephone service. Likewise, the handwritten information

---

[3] The government urges us to consider some of this evidence as relevant to the knowledge component of the crimes. In this case, the jury was given specific instruction that it had to find that Jimenez knew the means of identification belonged to an actual person, living or dead. Therefore the government did have to introduce evidence to prove it. We note, without comment, that other courts have generally construed the knowledge requirement of 18 U.S.C. § 1028A to extend only to knowledge that one lacks the lawful authority to use a means of identification, and not to require knowledge that the means of identification belongs to another. United States v. Hines, 472 F.3d 1038, 1039 (8th Cir. 2007); United States v. Montejo, 442 F.3d 213, 216 (4th Cir. 2006), cert. denied, 127 S. Ct. 366; United States v. Godin, 489 F. Supp. 2d 118, 120 (D. Me. 2007). But see United States v. Beachem, 399 F. Supp. 2d. 1156, 1158 (W.D. Wa. 2005) (requiring knowledge that the means of identification used belonged to another person).

regarding the Orange County Clerk's office tends to prove or disprove specific steps Jimenez took to obtain information about David Davison, whose death certificate was processed in Orange County. Before using another's Social Security number, of course, one must obtain it; the jury might reasonably think these were illustrative of research and preparation. The computer documents explain how to establish a new identity, likewise demonstrating Jimenez planning and preparing to misuse identities. The documents regarding Jared Figueroa's vital statistics show the jury how Jimenez went about creating the false identities he was charged with misusing; Jared Figueroa's information also appears on the handwritten lists, strengthening the inference that all of this was part of Jimenez's planning and preparation. Thus, even taking the evidence as extrinsic to the offenses charged, we hold it was not an abuse of discretion to admit it under Rule 404(b).

The government argues in this appeal that the handwritten lists and the computer documents were intrinsic to the offense, part and parcel of the crimes charged, or else tools of the trade of identity thieves. Because we hold that the district court did not abuse its discretion even if it admitted this as extrinsic evidence under Rule 404(b), we need not, and do not, decide this issue.

Finally, Jimenez claims that the district court abused its discretion in admitting the evidence because the danger of unfair prejudice substantially outweighed any probative value. See

Fed. R. Evid. 403 ("[E]vidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."). We have long noted that all relevant evidence is in some sense prejudicial because it leads the jury to find a material fact more or less likely. See United States v. Pinillos-Prieto, 419 F.3d 61, 72 (1st Cir. 2005) ("'Virtually all evidence is prejudicial . . . but it is only *unfair* prejudice against which the law protects.'" (quoting United States v. Pitrone, 115 F.3d 1, 8 (1st Cir. 1997))). For that reason the Rule 403 analysis is confined to "unfair" prejudice, and the scales do not tip in favor of exclusion unless the probative value is "substantially outweighed."

Evidence of past crimes or other bad acts carries an especially strong risk of unfair prejudice, but here the district court did not abuse its discretion in admitting the evidence.[4] While the evidence complained of might lead a jury to believe that Jimenez was embarked on a systematic program to identify and exploit the identities of others, this is not unfair prejudice. Indeed, this evidence engages the critical faculties of the jury -- rather than circumventing them -- by focusing attention on the way such crimes are committed and by showing the government's theory of how Jimenez approached such a task. Moreover, we are particularly

---

[4] The court below showed, rather, sensitivity to the possibility of unfair prejudice when it excluded references to the title of the "Anarchist Cookbook 2000," and when it prohibited references to other potentially inflammatory aspects of the case.

reluctant to overturn a trial judge's Rule 403 determination. See United States v. Flemmi, 402 F.3d 79, 86 (1st Cir. 2005) ("[O]nly rarely -- and in extraordinarily compelling circumstances -- will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." (internal quotation and citation omitted)). Here the district court had the benefit of both reflection and immediate response: It not only weighed the motion *in limine* in the abstract before trial, but also made the final determination in the midst of trial with all the benefit of immediate experience of the trial as it unfolded. The district court did not abuse its discretion in admitting this evidence, even when it is considered as extrinsic to the crimes charged.

## III. Aggravated Identity Theft

Jimenez argues that he cannot be guilty of the two counts of aggravated identity theft because the word "person" in the definition of that offense excludes the deceased.[5] The district

---

[5] Jimenez was convicted under 18 U.S.C. § 1028A(a)(1):

> In general. Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years.

Section (c) lists, inter alia, passport offenses, see 18 U.S.C. § 1028A(c)(7), and false statements relating to programs under the Social Security Act, see 18 U.S.C. § 1028(c)(11).

-10-

court issued a Memorandum and Order denying a motion to dismiss on this ground. The issue was preserved in an objection to the jury instruction that explicitly defined "person" as "living or deceased," as well as in a motion for a directed verdict. We review matters of statutory interpretation *de novo.* Turner, 2007 U.S. App. LEXIS, at *12; United States v. Frechette, 456 F.3d 1, 7 (1st Cir. 2006).

"When interpreting a statute, we begin with its text." United States v. Brown, 2007 U.S. App. LEXIS 20061, at *24 (1st Cir. Aug. 22, 2007) (citing Richardson v. United States, 526 U.S. 813, 818, 119 S. Ct. 1707, 143 L. Ed. 2d 985 (1999); Plumley v. S. Container, Inc., 303 F.3d 364, 369 (1st Cir. 2002)). Here, we first consider the single word Jimenez questions. Certain definitions of "person" do include only living persons. See American Heritage Dictionary 1310 (4th Ed. 2000) (giving, as primary definition of "person," "a living human"); 11 Oxford English Dictionary 597 (2d ed. 1989) ("person" in the sense of the physical body of a living human being). But others make no mention of the distinction. See, e.g., Merriam-Webster's Collegiate Dictionary 865 (10th ed. 2001) (primary definition: "human, individual"); Webster's New Third International Unabridged 1686 (1993) (primary definition: "an individual human being"). Indeed, the word's meaning largely depends on context -- person as distinguished from animal, person as distinguished from mind or soul, person as distinguished from

-11-

corpse. Some legal definitions of person include corporations and similar business entities. See, e.g., 1 U.S.C. § 1. "As often happens under close scrutiny, the plain text is not so plain." United States v. Councilman, 418 F.3d 67, 73 (1st Cir. 2005) (en banc). The word "person" in isolation admits of more than one meaning.

When the plain meaning of a word is not clear, we consider surrounding language and the statute's structure. Aggravated identity theft has two variations, defined in consecutive sections. 18 U.S.C. § 1028A(a)(1) & (2). The first ensnared Jimenez and is set forth above. The second relates specifically to terrorism and applies to those who " . . . possess[], or use[] . . . without lawful authority . . . a means of identification of another person or a false identification document" during or in relation to the commission of one of the offenses enumerated in the definition of "Federal crime of terrorism." 18 U.S.C. § 1028A(a)(2) (citing 18 U.S.C. § 2332b(g)(5)(B)). The phrase "means of identification of another person" is identical in subsections (a)(1) and (a)(2), strongly intimating that it has the same meaning in both. See Comm'r v. Lundy, 516 U.S. 235, 250, 116 S. Ct. 647, 133 L. Ed. 2d 611 (1996) ("close proximity" of two statutory provisions "strengthen[s] the normal rule of statutory construction that

-12-

identical words used in different parts of the same act are intended to have the same meaning" (internal quotation omitted)).[6]

Section 1028A(a)(2) refers to "means of identification . . . or a false identification document." "Means of identification" includes "any name or number that may be used . . . to identify a specific individual."    18  U.S.C.  §  1028(d)(7).    "False identification document" comprises any false or falsified "*document* of a type intended or commonly accepted for the purposes of identification."   18 U.S.C. § 1028(d)(7) (emphasis added).   The meaning of "person" urged would not punish those using Social Security Numbers identifying the dead unless the defendant happened to possess the Social Security card or another "identification document." To avoid this nonsensical result, "person" in subsection (a)(2) must refer to persons both living and dead.  And "person" in subsection (a)(1) most likely has the same meaning as in (a)(2). The structure of the statute resolves any initial ambiguity in the

---

[6] Jimenez makes a similar, but opposing, structural argument that the sentencing provisions in 18 U.S.C. § 1028A(b) use the word "person" and must mean only living persons.  This argument is without merit.   Section 1028A(b) uses "person" three times, and none of the uses require reading "person" as "living person": first, "a court shall not place on probation any person"; second, "no term of imprisonment imposed on a person"; and third, "a term of imprisonment imposed on a person."  But in each of these cases, the rest of the phrase does the work of excluding the dead -- we do not place dead persons on probation, nor impose terms of imprisonment on them -- leaving "person" free to take on the larger meaning.

-13-

word "person"; we agree with the district court that the broader definition is the correct one.[7]

The apparent purpose of the statute confirms this interpretation. A false identity built on the bedrock foundation of real means of identification -- that is to say, actual Social Security numbers, real names and dates of birth -- provides better cover for the wrongdoer than would one based on wholly fabricated identities, regardless of whether the person whose means of identification is used is alive.[8] From a deterrence perspective, a stiffer penalty is logically called for when the risk of detection decreases. But a more commonsense analysis is just as persuasive. The statute punishes two kinds of behavior: first, the use of false identities that are less susceptible of detection in a broad class of felonies, and second, the use of *any* false identity document in the commission of a terrorism-related offense. The use of any identity other than one's own in a terrorism offense merits punishment. But the use of the means of identification of another real person also qualifies for harsher punishment because this kind

---

[7] We note that this conclusion comports with that of the district court in United States v. Kowal, 486 F. Supp. 2d 923 (N.D. Iowa 2007).

[8] A false identity created from the means of identification of the deceased may even be *superior* to one stolen from the living. The dead, after all, will not create conflicting paper trails or notice strange activity on their credit reports. This is certainly the opinion of the section of the "Anarchist Cookbook 2000" entitled "How to Create a New Identity," which was seized from Jimenez and introduced at trial.

-14-

of identity theft is particularly potent and therefore a particular threat. Because the structure and purpose of the statute dispel any lingering ambiguity in the plain language, we decline to consider legislative intent.

Nor does the rule of lenity avail Jimenez. The rule of lenity requires that ambiguity in a criminal statute be resolved in favor of the accused. Cleveland v. United States, 531 U.S. 12, 25, 121 S. Ct. 365, 148 L. Ed. 2d 221 (2000) ("[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."); Hughey v. United States, 495 U.S. 411, 422, 110 S. Ct. 1979, 109 L. Ed. 2d 408 (1990) ("[L]ongstanding principles of lenity . . . demand resolution of ambiguities in criminal statutes in favor of the defendant . . . ."). But genuine ambiguity requires more than a possible alternative construction. See Caron v. United States, 524 U.S. 308, 316, 118 S. Ct. 2007, 141 L. Ed. 2d 303 (1998) ("The rule of lenity is not invoked by a grammatical possibility. It does not apply if the ambiguous reading relied on is an implausible reading of the congressional purpose."); Muscarello v. United States, 524 U.S. 125, 138-39, 118 S. Ct. 1911, 141 L. Ed. 2d 111 (1998); Moskal v. United States, 498 U.S. 103, 108, 111 S. Ct. 461, 112 L. Ed. 2d 449 (1990) ("[W]e have always reserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even *after* resort to the language and structure, legislative history and motivating policies of the

-15-

statute." (internal quotation omitted)); McElroy v. United States, 455 U.S. 642, 658, 102 S. Ct. 1332, 71 L. Ed. 2d 522 (1982) (declining to apply rule of lenity absent "significant questions of ambiguity"). We recently wrote that the rule "only applies if there is a grievous ambiguity in the statute." Councilman, 418 F.3d at 83 (quoting Muscarello, 524 U.S. at 139) (internal quotation marks omitted). A brief review of two cases where we invoked the rule of lenity will illuminate the nature and scope of the ambiguity required.

United States v. Anzalone, 766 F.2d 676 (1st Cir. 1985), concerned a man charged with violating the Currency Transaction Reporting Act ("CTRA") by failing to inform a bank of transactions structured to avoid its requirements. The government brought charges relating to schemes to conceal material facts from the government, 18 U.S.C. § 1001, and aiding and abetting criminal acts against the government, 18 U.S.C. § 2. Anzalone, 766 F.2d at 679. We applied the rule of lenity because "nothing on the face of either the [CTRA] or its regulations, or in their legislative history [supported] the proposition that a 'structured' transaction by a customer constitutes an illegal evasion of any reporting duty of that customer." Id. at 681. Hence, the statute was sufficiently ambiguous to trigger the rule of lenity. We likewise disposed of the government's charges under the CTRA itself, because the Secretary of the Treasury required reporting by *banks*, not

individuals. Because the regulations did not impose duties on Mr. Anzalone directly, we applied the rule of lenity to the charges under the statute because Mr. Anzalone did not have fair notice of his liability. Id.

In United States v. Borowski, 977 F.2d 27 (1st Cir. 1992), the rule of lenity compelled us to vacate defendants' convictions where the Clean Water Act was ambiguous as to whether the conduct was criminal. The question in that case was whether, in dumping waste into the municipal sewage system, a manufacturer had "thereby" placed its own workers at risk. We applied the rule of lenity because "thereby" was ambiguous and violating the Clean Water Act was not a but-for cause of the risk.[9] But mere ambiguity

---

[9] The textual ambiguity in that case turned on whether the word "thereby" had a causal component:

> In one sense, it can be said that the knowing violation "thereby" placed the employees in danger. After all, the defendants knew that the sinks were connected to the publicly-owned sewer and treatment works and that the wastes would therefore illegally proceed without interruption to the publicly-owned treatment works. They also knew that the employees' actions in performing the dumping as instructed placed them in imminent danger. Arguably, therefore, through the knowing violation the defendants "thereby" endangered the employees. On the other hand, there could be no violation unless the wastes ultimately ended up in a publicly-owned sewer and treatment works. But the risks and dangers to these employees would have been the same if the plugs had always remained in the sinks so that no discharge to the publicly-owned treatment works (and therefore no § 1317 violation) ever occurred. The danger to the employees was inherent in their handling of the various chemical solutions, solutions that were part of the [defendant corporations'] manufacturing process. They would have been subject to the identical hazards had they been

-17-

in the language was not enough. We went on to note that the purpose of the Clean Water Act is to protect the nation's waters, not industrial workers. Id. at 31 ("One can read the entire statute in vain for any protection mechanism for industrial employees who work with wastes at the point of discharge.").

Each of these cases reveals deep ambiguity in the underlying statute. In Anzalone, the statute made no mention of treating several transactions as one. Further, the regulations promulgated under the statute excluded the defendant altogether from any positive duties. In Borowski, the ambiguity in the statute's language was less obvious, but still palpable: "Thereby" does connote causation. Moreover, the ambiguity was deepened, not resolved, by the purpose of the statute as a whole because the statute was not aimed at protecting industrial workers.

We have also applied the rule of lenity where no common definition of a term exists and there is "insurmountable doubt" as to the intent of Congress. United States v. Bowen, 127 F.3d 9, 14 (1997) (applying rule of lenity when experts offered conflicting definitions of "hashish oil" and district court found "no scientific or universally accepted precise definition of the term"). Before

---

dumping the chemicals into drums or other containers for appropriate treatment under the Act. In that respect, therefore, although the defendants knew that their employees were placed in imminent danger, that danger was not caused by the knowing violation of § 1317.
Borowski, 977 F.2d at 30.

applying the rule of lenity, we sometimes seek answers even beyond the language and purpose of the statute. See United States v. Gibbens, 25 F.3d 28, 35 (1st Cir. 1994) (examining, in addition to statute's meaning and Congress' purpose, "more recondite sources" such as analogies from other areas of the law before applying rule of lenity).

Viewed in light of these applications of the rule of lenity, the case before us resolves itself. The language is not sufficiently ambiguous -- the natural reading of the word "person" in the phrase "means of identification of another person" includes persons deceased. Were one presented with one's late father's Social Security card, for example, and asked whether that was the means of identification of a person, the natural response would be, "Yes, it is my father's," rather than, "No, it is not the means of identification of a person: It used to be the means of identification of my father, but he is deceased." And even if sufficient ambiguity were found in the language, we have already pointed out that other methods of statutory interpretation resolve the ambiguity. The structure of the statute weighs in favor of this reading. Finally, the purpose of the statute is to create an additional penalty for using false identities that are particularly difficult to expose or that are used in conjunction with terrorism offenses. This purpose arises from the need to identify accurately those who claim the benefits and protections of citizenship.

**AFFIRMED**.